In the Matter of the Disposition of the Real Estate of the Estate of STILMAN B. SANDERS, Deceased, for the Payment of his Debts.

(*Surrogate's Court, Herkimer County, Filed May* 15, 1893.)

1. LIMITATION—PAYMENT.

A payment, in order to have the effect of a renewal of the obligation or an extension of the time in which an action may be brought, must be made by the party who is sought to be held; not necessarily in person, but by him or by his agent authorized to do that act for him, so that it is his payment.

2. SAME—SURETYSHIP.

A note made by the decedent and one P. was given to the aunt of the latter to raise money to pay off a prior note made by P. and indorsed by decedent. All the payments on such note were made by P., who made all the indorsements. Decedent at one time asked to be allowed to take his name off, which the payee refused, but expressed no surprise, and decedent said that he would see that it was paid, and that P. had made enough on the place to have paid it. *Held,* sufficient to show that the payee understood that decedent was only a surety.

3. SAME.

It was claimed that a delivery of hay by P. was a payment by decedent on the note. The evidence showed that on the payee sending for hay, decedent said that P. was away, and that when he returned the payee could have it; that subsequently on examining the note he expressed surprise that the hay was not indorsed thereon, and the payee replied that she and P. were in the habit of letting their accounts run and indorsing them in one indorsement. P. testified that all the hay delivered was his property. *Held,* that a payment by decedent or by P., as his agent, was not shown.

Upon the return of citations Hudson B. Farrington appeared and presented a claim to be proved against the estate based upon

a promissory note assigned to him by the payee, Madeline Harter, which was dated March 8, 1875, for $1,200, executed by Thomas R. Petrie and Stillman B. Sanders, payable one year after date, with interest, and was the joint and several note of the said makers. Sanders died September 18, 1890. Thomas R. Petrie and Marietta S. Gardner were appointed administrators of his estate on October 9, 1890.

The administrators interpose the statute of limitations as a defense to the claim against Sanders' estate.

On January 1, 1887, Thomas R. Petrie delivered to Madeline Harter, to be applied as a payment on the note, 1,235 lbs. of hay of the value of $8.02, and the claimant asserts that this payment was made by Petrie as the agent of Sanders, by Sanders' direction, and was a payment by Sanders upon the note, and that by such payment Sanders renewed his obligation on the note.

J. A. & R. E. Steele, for claimant; Steele & Prescott, for administrators.

SHELDON, S.—It is well settled that one of the joint and several makers of a promissory note cannot, by his own act in making a payment thereon, postpone or avoid the bar of the statute of limitations as to the other makers, and this is so whether the one making the payment is the principal debtor and the other makers are sureties, or whether the surety makes the payment. In any case a payment, in order to have the effect of a renewal of the obligation or an extension of the time in which an action may be brought, must be made by the party who is sought to be held, not necessarily in person, but by him or by his agent authorized to do that act for him, so that it is his payment. First National Bank of Utica v. Ballou, 49 N. Y. 155; Littlefield v. Littlefield, 91 id. 203.

In the case last cited it appeared that the holder of a joint and several note long past due went to one of the makers, who was a surety for the other maker, and in substance asked for payment. The surety asked the holder to wait until the maker

came home and sent the principal maker a message by the holder saying, "Tell him for me that he must pay the interest and as much of the principal as he can; and that I say so." The principal maker came home, and the holder delivered the message as directed, and some months afterward the principal made a payment on the note and afterwards told the surety of making the payment and the surety said that it was all right. It is clear that the effect of the acts of the parties was not otherwise than as though the surety had gone to the principal maker of the note and said to him "You must make a payment on that note; pay the interest and as much of the principal as you can;" in pursuance of this direction the principal maker makes a payment upon the note, and soon after informs the surety of it, and the surety says "All right; that is what I told you to do." Such a payment is one made with the knowledge and approval of the surety, and in one sense by the direction of the surety, for he instigated the payment, he set the maker in motion, and directed him to make the payment and the payment inured to the benefit of both principal and surety in the reduction of the debt, and if such payment was the joint act of principal and surety it would be a payment by the surety, and he could not avail himself of the statute of limitations until six years thereafter, but such payment cannot be held to be the joint act of principal and surety; the principal makes the payment out of his funds; he is only discharging his obligation both to the holder of the note and to the surety; the surety in urging the principal to make a payment was only urging him to do his duty. It is competent for the surety to direct the maker to make a payment as the act and payment of both, although made with the means of the principal, and if so made, it will have the same effect as though made personally by the surety, but to establish such a payment the proof must be clear and unequivocal. In a case where the makers of a joint and several note were equally liable as between themselves, and one of the makers had upon the request and direction of the others made a payment upon the note, or in a case where the surety made a payment upon the re-

quest of the principal maker of the obligation, there is ground for contention that such payment is the joint act of the one requesting and the one making the payment, because the principal maker, who requests and induces the surety to make a payment, is thereby discharging his own duty, and contracting a fresh obligation to the surety for the money advanced by the surety to make the payment for the principal.

In the application of these principles to the case in hand, I will first consider in what relation to the other maker of the note was Stillman B. Sanders. It is clearly shown that, at the date of the note, Petrie was the maker and Sanders one of the indorsers of a note held by William Reynolds, upon which there was due $1,765, upon which Petrie was the principal debtor, and Sanders was surety, and that the consideration of the note in suit was $1,200 furnished by Madeline Harter, the payee, to pay off the Reynolds note. I think it must be found as a fact that Madeline Harter knew of the fact that Petrie had the benefit of the $1,200, and that as between themselves Sanders was only surety for Petrie upon the note. Miss Harter was Petrie's aunt. Petrie testifies that before getting the money he had talked with Miss Harter about it, and told her that he was paying Reynolds a *bonus* for the use of his money which he wished to get rid of, and this testimony is not contradicted. Reynolds was paid at Newport, and Miss Harter went to Newport on the day of the payment with either Sanders or Petrie to furnish the $1,200. In support of this finding some weight must be given to the fact that Petrie personally attended to making the payments. None of the indorsements are in Sanders' handwriting; and all, except one made by Miss Harter, are in Petrie's writing; there is no dispute but that nearly all the payments of interest were made by Petrie with his own funds. The fact, as testified to by Mary A. Farrington, the wife of the claimant, that in the spring of 1887 Sanders asked Miss Harter to allow him to take his name off the note, and her reply refusing, but without surprise at such request, and Sanders' remark following in the same conversation that he should

see that it was paid; that Petrie could have made enough on the
place to have paid it long before now, but that she should have,
her pay, and that he considered that and one other as sacred,
and that these were all that he was holden for; all this indicates
a mutual understanding between Miss Harter and Sanders that
Sanders was only a surety on the note.

I think it must also be found that the hay delivered to Miss
Harter January 1, 1887, to apply on the note was the property
of Petrie, and that Miss Harter so understood it. Petrie testi-
fied that about the year 1871 he made an oral agreement with
Sanders, whereby he was to give Sanders $100 a year and his
support for the use of the farm, and that he occupied the farm
under that agreement down to 1890.

There was no direct contradiction of Petrie's testimony in
this respect, and he testified also directly that all the hay deliv-
ered to Miss Harter, as well as the other products of the farm
delivered to her, all of which was applied upon the note in ques-
tion or upon other notes of Petrie's held by her, was his prop-
erty. Now, what is the testimony relied upon to show that
Sanders, the surety, made a payment upon the note by Petrie
as his agent with and by means of the load of hay, which was
Petrie's property?.

Varnum S. Farrington, called as a witness, in behalf of the
creditor, testified that at the request of Miss Harter he deliv-
ered a message from Miss Harter to Sanders as follows: "I
told Mr. Sanders that Miss Harter, or Lainy, wanted him to
send her some hay for her cows, and he said that Petrie was not
at home, and when Petrie came home he would send the hay
to her."

Mary A. Farrington, the wife of the creditor, was called as a
witness in his behalf and gave testimony concerning a conver-
sation between Sanders and Miss Harter in the spring of 1887
at her house, as follows: "They talked for some time about
church matters; then he asked if the interest had been paid on
the note, and she replied, not all of it; he then asked if she had
any objections to his seeing that note of his and Petrie's; she

said no, and got the note for him to see; he looked at the note, and seemed surprised, and asked if she had not had that hay; he said that he had told Petrie to bring the hay to apply on the note; he told him to do so, and supposed that he had done so, and she replied that he had brought the hay, but that she and Petrie were in the habit of letting their accounts run, and then footing them up and indorsing them in one indorsement." In the same conversation Sanders made the remark "that Petrie could have made enough on the place to have paid it long before now."

It is claimed that this conversation referred to the hay delivered to Miss Harter by Petrie January 1, 1887, although it is far from clear that this was so; for by the hay bills it appeared that Petrie had delivered a load of hay to Miss Petrie November 24, 1886; another load January 1, 1887, and another load February 10, 1887. These several loads of hay were all payments upon the note, and while it is not impossible that one of these loads of hay was sent by Sanders as a payment by him, the more natural and probable view of the case is that the payments of hay all stood upon the same footing, and that Sanders' view of the transaction, at each time that Petrie took a load of hay to Miss Harter, was that Petrie had done his duty, had made a payment; and it is not probable that it ever came into his mind that he, Sanders, had made a payment to Miss Harter.

Sanders, the surety, could not easily have supposed or intended that when Petrie, the principal debtor, was delivering his own property in payment of his own debt that he, the surety, was making the payment, although at the request of Miss Harter he had told Petrie to bring the hay.

It is evident that Miss Harter knew of no reason for treating any load of hay delivered about this time as a payment by Sanders, or any differently than any other of Petrie's payments. She supposed the payments to be Petrie's payments, for she told Sanders that Petrie had brought the hay, "but that she and Petrie were in the habit of letting their accounts run and then footing them up and indorsing them in one indorsement."

A careful consideration of the circumstances and the inferences to be drawn from the testimony does not permit of the conclusion that Petrie was acting as the agent of Sanders when he delivered hay to Miss Harter about Jan. 1, 1887, to apply as a payment on the note. Mr. Sanders did not make that payment. Therefore, the statute of limitations had barred an action on the note as against Sanders prior to his death, and the note and the claim cannot be established as a debt to be paid out of Sanders' real estate in this proceeding.